Matthew I. Knepper, Esq.
Nevada Bar No. 12796
Miles N. Clark, Esq.
Nevada Bar No. 13848
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Suite 170-109
Las Vegas, NV 89129
Phone: (702) 825-6060
FAX: (702) 447-8048
Email: matthew.knepper@knepperclark.com
Email: miles.clark@knepperclark.com

David H. Krieger, Esq.
Nevada Bar No. 9086
HAINES & KRIEGER, LLC
8985 S. Eastern Ave., Suite 350
Henderson, NV 89123
Phone: (702) 880-5554
FAX: (702) 385-5518
Email: dkrieger@hainesandkrieger.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| RODNEY MOTT,<br>　　　　　Plaintiff,<br>　　v.<br><br>TRINITY FINANCIAL SERVICES, LLC,<br>AND TRINITY RECOVERY SERVICES,<br>LLC,<br>　　　　　Defendants. | Civil Action No.: 17-CV-1754-RFB-GWF<br><br>**PLAINTIFFS' MOTION FOR PARTIAL**<br>**SUMMARY JUDGMENT** |

**INTRODUCTION[1]**

Plaintiff Rodney Mott ("Plaintiff") moves for partial summary judgment on his presently pending individual claims as against defendants Trinity Financial Services, LLC

---

[1] All references to Trinity Financial's "interest" in Plaintiff's Loan and Note are made for ease of reference. Plaintiff in no way concedes that Trinity Financial, Trinity Recovery, Trojan, or any of their related entities or agents ever had authority to enforce any interest in his "loan" or "note," because as outlined below, the loan was forgiven years ago.

("Trinity Financial Services, LLC ("Trinity Financial") and Trinity Recovery Services, LLC ("Trinity Recovery") for liability only.[2]  Plaintiff believes his damages are best left for a jury of his peers. Summary judgment is appropriate for several reasons.

This case has to with Defendants' impermissible access of Plaintiff's private credit information, in violation of the Fair Credit Reporting Act, particularly 15 U.S.C. § 1681b(f). Succinctly, Plaintiff pulled his credit reports on January 1, 2016 and January 27, 2017, only to discover several credit pulls from "Trinity Financial SE via CREDCO," "Credco/Trinity Recovery Svcs," "Credco/Trinity Financial," "Trinity Recovery Service."[3]  On information and belief, these pulls had all been made by Defendants, who never had a legitimate business relationship with Plaintiff because the debt underlying his obligation had been forgiven years ago.[4]  Thus, Plaintiff sued Defendants under 15 U.S.C. § 1681b, which prohibits defendants from acquiring his personal credit information without a permissible purpose.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[5]

### **Plaintiff Incurs an Obligation with First Franklin which is Forgiven.**

1.      December 2005, Plaintiff incurred a financial obligation (the "Debt") to First Franklin Loan Services ("First Franklin"), which was secured by a deed of trust encumbering his home in Las Vegas, Nevada (the "Property").[6]  In 2007 he refinanced the Debt, which was split into senior and junior portions.[7]  First Franklin retained the Junior Loan.[8]

---

[2] Plaintiff has also moved for case-terminating sanctions against these defendants for their failure to sit for their noticed depositions, and submits that any ambiguities regarding document authentication, corporate structure, or other matters relevant to resolution of this Motion for Summary Judgment are attributable to Defendants' refusal to sit for their properly noticed depositions.  *See* ECF Dkt. 27.

[3] *See* Complaint, ECF Dkt. 1.

[4] *See id.*

[5] Plaintiff requests that the Court take judicial notice of all publicly filed documents referenced in this motion.  Plaintiff requests this Court take judicial notice of any cited documents made in court filings as matters of public record, pursuant to Fed. R. Civ. P. 201(b).  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.11 (9th Cir. 2006) (citing *Burbank–Glendale–Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir.1998)).

[6] Declaration of Rodney Mott, at ¶ 5 **Exhibit C** ("Mott Decl.").

[7] *Id.* at ¶ 6.

2.      In June 2009, First Franklin sent Plaintiff a letter ("Forgiveness Letter") which stated that "First Franklin Loan Services, the mortgage servicer . . . has closed your account" and would not be collecting on it.  First Franklin also informed Plaintiff that he had "no further financial obligation regarding this account and all debts will be canceled.  You will receive full forgiveness of the remaining principal balance of $293,318.39 on your account, including all interest and outstanding fees."[9]  First Franklin stated that "Based on the documents you presented to us, we have instructed all three major reporting agents that the above-referenced account number was paid as agreed."[10]  Finally, First Franklin advised Plaintiff that it would be reporting the amount of the cancelled principal debt to the IRS.[11]

3.      As a result of First Franklin's 2009 communication, Plaintiff believed the credit relationship between himself and First Franklin had terminated and closed; nor did Plaintiff subsequently enter into any new credit relationship(s) with First Franklin that could in any way revive the closed account.[12]

**Dreambuilder Informs Plaintiff that Trinity Financial Has "acquired" Plaintiff's Loan.**

4.      In related court filings,[13] Trinity Financial's President, Don A. Madden, has declared that that "Trinity [Financial] is engaged in purchasing defaulted loans served by second deeds of trust for investment purposes."[14]  Trinity Financial purportedly entered into a sale agreement for the property as of March 13, 2015.[15] The agreement was between Trinity

---

[8] *Id.*

[9] *Id.* at ¶ 7.

[10] *Id.*

[11] *Id.*

[12] *Id.* at ¶ 8.

[13] In 2016 Plaintiff sued, *inter alia*, Trinity Financial for alleged contract and statutory violations in connection with their purported acquisition of a second mortgage on his home. *See Mott v. The PNC Financial Services Group, Inc.*, No. 16-cv-1949-JCM-CWH, ECF Dkt. 1 (D. Nev.) (filings from which are referred to as "Collateral Litigation").

[14] *See* July 31, 2017 Declaration of Don A. Madden in the Collateral Litigation, ECF Dkt. 108, at ¶ 3 (D. Nev.) ("July 2017 Madden Decl."), **Exhibit B-11**.

[15] *See* Excerpts of Record Return from Dreambuilder: May 13, 2015 Agreement Between Trinity Financial and Stelis (sealed; redacted in original) ("Stelis Contract"), **Exhibit B-15**; *see also* July 10, 2018 Declaration from Dreambuilder Investment LLC's Custodian of Records ("DBI COR"), **Exhibit B-14**.  During discovery, defendants refused to state how

Financial and Stelis, LLC.[16]  However, around that time the CEO of Stelis's managing LLC—Ophrys, LLC—had declined to authorize many proposed sales two days before, on March 11, 2015.[17]  Indeed, Trinity was told on March 30, 2015 that 210 loans had been requested, but transfer approval for only 38 of the loans had been provided at that time.[18]  It is far from clear when Trinity first obtained any authorization for the sale which included Plaintiff's long-forgiven loan with First Franklin.[19]  Trinity Financial failed to produce any documentary evidence of its policies and procedures for conducting due diligence prior to acquiring second deeds of trust and loan notes for investment purposes.[20]

5.    On April 15, 2015, Dreambuilder Investments, LLC ("DBI") mailed Plaintiff a letter stating that "Effective April 30, 2015, [DBI] has authorized the transfer of the servicing of the loan referenced above from Land Home Financial Services to Trinity Financial Services, LLC."[21]

---

much they paid for their "interest" in Plaintiff's property.  However, in the copy of the records provided by DBI, the redactions appear to have been partially made on these numbers.  *See* Stelis Contract, at DBI 196.  In particular, there is a single number, followed by a comma, followed by three numbers, followed by a period, followed by two numbers. Assuming ordinary accounting, it appears that Trinity paid less than $10,000 to acquire this $300,000 interest.  *See id.*

[16] *See* Stelis Contract, at DBI 193.

[17] *See* Apr. 27, 2015 Declaration of William Weinstein in *Palmer v. Cerastes, LLC*, No. 14-cv-9462-PAC, ECF Dkt. 67, at ¶ 21 (S.D.N.Y.) ("Weinstein Decl."), **Exhibit B-17**.

[18] Excerpts of Record Return from Dreambuilder: Emails Between Trinity and Land Home Financial Services  (sealed) ("Trinity/DBI Emails"), **Exhibit B-16**.

[19] Elsewhere, Trinity Financial's President, Don A. Madden, has declared that Trinity Financial acquired Plaintiff's purported note and second deed of trust as "one of approximately 159 loans received on March 13, 2015" from *Dreambuilder*," but not Stelis. July 2017 Madden Decl., at ¶ 9.  Madden also declares that Trinity Financial "had received other pools of loans from Dreambuilder . . . before the pool which involved the Mott loan." *Id.*

[20] Trinity Financial Services, LLC's Jan, 25, 2018 Supplemental Responses to Plaintiff's First Set of Interrogatories and Requests for Production, at RFP No. 2 ("Trinity Financial Discovery Responses"), **Exhibit B-1**; Aug. 10, 2018 Declaration of Miles Clark, at ¶ 6 ('Clark Decl."), **Exhibit B**.

[21] Mott Decl., at ¶ 9; Apr. 15, 2015 Letter from Dreambuilder to Plaintiff (redacted) ("DBI Plaintiff Letter"), **Exhibit C-1**.  Additionally, in contradiction to this letter from Dreambuilder Investments, on November 10, 2015, Land Home Financial Services, Inc. sent Plaintiff a letter indicating "the servicing of your mortgage loan . . . is being assigned, sold or

**<u>Plaintiff Instructs Trinity to Cease Pulling His Credit Report; Trinity Transfers the "Loan" to Another Entity, Trojan, in a pool of loans.</u>**

6.     Plaintiff believes that he has never had any business relationship with Defendants at all.[22]  As of February 25, 2015, Plaintiff had no knowledge or prior contact with either Trinity Financial or Trinity Recovery.[23]  There is no mention of Trinity Recovery in the Trinity Financial / Stelis agreement, Dreambuilder's April 15, 2015 letter, or any subsequent communication to Plaintiff.[24]

7.     In discovery, Trinity Financial produced a "U.S. Consumer Privacy Notice" in which it describes the information it can share with affiliates.[25]  Trinity Financial's notice states that "when you are no longer our customer, we continue to share your information as described in this notice."[26]  The Privacy Notice also states that, "you can contact us at any time to limit our sharing."[27]

8.     There is no evidence that Plaintiff ever received this Notice during 2015 after Trinity Financial "acquired" his loan.[28]  However, on October 8, 2015, Plaintiff sent Trinity a cease and desist letter, which stated that he did not have a business contract with Trinity Financial.[29]  The letter also informed Trinity Financial that "the publishing of any derogatory information to any . . . Third Party not specifically authorized by me, will be strictly prosecuted to the full extent of the law."[30]  By this letter, Mott explicitly notified Trinity

---

transferred from Land Home Financial Services to Trinity Financial Services, LLC, effective 11/25/2015."  Proposed Amended Compl., ECF Dkt. 8-1, at ¶ 19.

[22] Mott Decl., at ¶¶ 3 n.1, 10.

[23] *Id.* at ¶ 13.

[24] *See, e.g.*, *id.* at ¶¶ 12-13.

[25] Clark Decl., at ¶ 15; Trinity Financial U.S. Consumer Privacy Notice, at 1 ("Privacy Notice"), **Exhibit B-10**.

[26] Privacy Notice, at 2.

[27] *Id.*

[28] *See* Mott Decl., at ¶¶ 12-13.

[29] Mott Decl, at ¶ 12; Oct. 8, 2015 Cease and Desist Letter from Plaintiff to Trinity Financial (redacted) ("Cease and Desist Letter"), **Exhibit C-2**.

[30] *Id.*

Financial that any sharing of his private information with Trinity Financial's affiliates had been revoked.[31]

9.      On October 14, 2015, Trinity Financial Services, LLC mailed Plaintiff a letter stating that "Effective October 30, 2015, Trinity Financial Services, LLC is transferring the servicing of the loan or line of credit . . . to Trojan Capital Investments, LLC ["Trojan"].  The transfer does not change the terms or conditions of your note agreement or any mortgage, other than certain terms relating to their servicing."[32]  According to Don Madden, Trojan "is engaged in purchasing second trust deeds and corresponding loan notes for investment purposes.  Trojan obtains loans from Trinity that Trinity has purchased."[33]  As with the actual "sale" of the loan, there is no evidence sufficient to establish any transfer of "interest" to Trojan that actually occurred, regardless of Trinity's representations to Plaintiff,[34] although the transfer appears to have covered 75 loans, including Plaintiff's.[35]

10.      On October 15, 2015, a Corporate Assignment of Deed of Trust was executed

---

[31] *Id.*

[32] Mott Decl., at 9.

[33] *Id.* at ¶ 6.

[34] Mr. Madden, has declared that Trinity Financial "transferred the Note and DOT to Trojan . . . on August 12, 2015 as part of a purchase of over 75 loans by Trojan from Trinity."  July 31 Madden Decl., at ¶ 20.  Then, on December 23, 2015, Trinity Financial Services, LLC recorded an affidavit from Mr. Madden signed on September 21, 2015, Instrument No. 20151223-0002975.  Dec. 23, 2015 Declaration of Don A. Madden, as attached in the Collateral Litigaiton, ECF Dkt. 12-6 (D. Nev.) ("Dec. 23, Madden Decl.") **Exhibit B-12**.  There, Mr. Madden affirmed that "Trinity . . . is currently the holder of the Mortgage / Deed of Trust and Note."  *See id.* at ¶ 4.  Trinity Financial later attempted to use Madden's declaration to dismiss Plaintiff's claims in the Collateral Litigation.  *See* Collateral Litigation, ECF Dkt. 9, at 9 (stating that "it is represented that *Trinity purchased and is the holder of the DOT and Note*.") (emphasis in original).  Plaintiff then sought to hold Trinity Financial to its own representations and demonstrated that by operation of the Uniform Commercial Code it could *never* be a *holder* and thus had no enforceable interest in the property, *see id.* at ECF Dkt. 19, 84 (re-urged after denial without prejudice).  In apparent response, Mr. Madden changed his position, and claimed that, in the same December 23, 2015 sworn declaration he used to try to dismiss Plaintiff's claims, "it was not my intent to misrepresent or mislead anyone that Trinity was a holder of the Note and DOT," but rather "I was trying to communicate for Trinity that Trinity had owned and possessed the original Note and original DOT."  July 31, 2015 Madden Decl., at ¶ 25.

[35] July 31, 2017 Madden Decl., at ¶ 20.

by Trinity Financial, assigning the beneficial interest in the Note to Trojan, Instrument No. 20160119-0000486.[36]

11.     Based on the foregoing, any relationship between Trinity Financial and Plaintiff was brought to Plaintiff's attention no earlier than April 15, 2015, and ended no later than November 25, 2015.[37]

**As of February 2015, Trinity Recovery's Contract with Credco Restricted Its Permissible Purpose as a Potential Investor or Services, and Did Not Identify that Any Affiliate Company Would Be Pulling Credit.**

12.     Trinity Recovery, but not Trinity Financial, contracted with a third party reseller of consumer reports, Corelogic Credco ("Credco").[38]  Trinity Recovery's contract with Credco did not list any affiliates.[39]  Trinity Recovery's original agreement with Credco listed permissible purposes as both (1) in connection with a credit transaction involving the consumer, and (2) as a potential investor or servicer.[40]  Trinity Recovery stated that its business purpose was "Account review of existing portfolio + credit review *prior* to acquisitions."[41]  However, in February 2014 Trinity Recovery relinquished the first of these purposes, and remained able to pull credit only as a *potential* investor or servicer – and again

---

[36] Oct. 15, 2015 Corporate Assignment of Deed of Trust, as attached in the Collateral Litigation, ECF Dkt. 12-7 (D. Nev.) ("Assignment"), **Exhibit B-13**.

[37] *See* DBI Plaintiff Letter; ECF Dkt. 8-1 at ¶ 19.

[38] *See* Contract Documents from Corelogic Subpoena Return (First 37 Pages) (redacted in original) and Trinity Recovery Discovery Return (Last 2 Pages) (redacted in original), ("Corelogic Contract Docs"), **Exhibit B-4**; *see also* July 10, 2018 Declaration from CoreLogic's Custodian of Records ("Corelogic COR"), **Exhibit B-3**; Clark Decl., at ¶ 8.  In order to distinguish between documents produced by Corelogic and Trinity Recovery, Plaintiff will refer to pages produced by Corelogic as "Corelogic" and pages produced by Trinity Recovery as "TFS."

[39] *See generally* Corelogic Contract Docs.

[40] Corelogic Contract Docs, at Corelogic 25.

[41] *Id.* at Corelogic 2 (emphasis added).  However, CoreLogic suggests that, in 2013, "Contact stated that he company business recently underwent a name change from Trinity Financial Services to Trinity Recovery."  *Id.* at Corelogic 9.  However, the business card provided by Madden to CoreLogic has the same logo as the "policy" documents used and produced in this case years later.  *Compare id.* at Corelogic 15, *with* Trinity Financial Policies, at TFS 4 ("Trinity Policies"), **Exhibit B-9** (noting March 1, 2015 document containing same logo); Clark Decl., at ¶ 14.

listed no affiliates for which it would be pulling credit.[42]   The February 2014 Credco agreement required Trinity Recovery to certify "that it will use the Credit reports solely for one or more of the following purposes set forth below," and "*shall not use the Credit Reports for any other purposes.*"[43]   As of February 12, 2015, Trinity Recovery appeared to remain the entity specifically authorized to pull credit.[44]   Thus, as of February 2015 only Trinity Recovery was authorized to pull credit from Credco, and Trinity Recovery was restricted in pulling credit only as a *potential* investor or servicer, and was *not* authorized to pull credit to review an account.  Further, no iteration of the Credco contract mentioned Trojan.[45]

### Trinity Recovery's Contract with Experian Did Not Identify Trinity Financial in Any Capacity.

13.     Trinity Recovery also appears to have contracted with consumer reporting agency Experian on October 10, 2013.[46]   The Agreement states that "Under no circumstances will [Trinity Recovery] resell or otherwise disclose to any other person, other than employees or agents whose duties reasonably relate to the lawful business purpose for which the Services were obtained, any of the Services or data that Experian delivers to Client."[47]   The Agreement further states that "The Services and data shall only be used as expressly authorized in this Agreement or in any Schedule,"[48] and required Trinity Recovery to

---

[42] Corelogic Contract Docs, at Corelogic 42-44.  Trinity Financial is nonetheless later listed as an entity on a "Customer Profile."  *See id.* at Corelogic 46-48.

[43] *Id.* at Corelogic 42 (emphasis added).

[44] *See id.* at TRS 11-12.

[45] *See generally* Corelogic Contract Docs.

[46] Oct. 30, 2013 Contract and September 4, 2013 Permissible Purpose Sheet Between Experian and Trinity Recovery (redacted in original) ("Experian Contract"), **Exhibit B-8**; Clark Decl., at ¶ 13.  The Agreement was made between Trinity Recovery, Experian Information Solutions, Inc., and Experian Marketing Services, Inc."  *Id.* at 1.  The Agreement notes that "All data in Experian's databases and any other intellectual property that are part of the Services are and will continued to be Experian's exclusive property."  *Id.*  The Agreement further specifies that Trinity Recovery "acknowledges that Experian maintains several databases updated on a periodic basis, and that Experian does not undertake a separate investigation for each inquiry or request for Services made by the Client."  *Id.*

[47] *Id.*

[48] *Id.*

"comply with all federal, state and local laws . . . applicable to . . . [Trinity Recovery's] use of the Experian data and Services provided pursuant to this Agreement."[49]

14.     While Experian did not appear to require Trinity Recovery to specify every permissible purpose it had to pull credit, on September 4, 2013, Trinity Recovery signed a "Request for Certification of FCRA Permissible Purpose / Appropriate Use," in which Trinity Recovery specified that the purpose of pulling credit was that "Our company purchases debt from banks.  We evaluate and purchase individual assets based on specific criteria."[50]  Further, nowhere in this contract is Trojan mentioned.[51]

**Trinity Financial Failed to Produce Any Agreement with Trans Union During the Time it Held an "Interest" in Plaintiff's Loan.**

15.     Trinity Financial failed to produce any agreement with consumer reporting agency Trans Union operative during the time it claims to have held any "interest" in Plaintiff's "loan."  Instead, on May 12, 2016, Trinity Financial and Trans Union entered into a "Master Agreement for Consumer Reporting and Ancillary Services."[52]  The agreement requires that "Subscriber certifies that it shall request Consumer Report Information solely for Subscriber's *exclusive one-time use* and use such information *solely for the permissible purpose(s) set forth below . . . and for no other purpose . . .*"[53]  The agreement further clarified that "[n]othing in this certification, or elsewhere in this Agreement, is intended to allow Subscriber to purchase Consumer Report Information for *the purpose of selling or giving the report, or information contained in or derived from it, to . . . any other third party, and Subscriber expressly agrees to refrain from such conduct.*[54]  The Agreement also specifies that for "account review" inquiries, "Subscriber shall make such requests solely for

---

[49] *Id.*

[50] *Id.* at 3.

[51] *See generally* Experian Contract.

[52] May 12, 2016 Master Agreement for Consumer Reporting and Ancillary Services Between Trans Union and Trinity Financial ("TU Contract"), **Exhibit B-6**; Clark Decl., at ¶ 11.

[53] TU Contract, at 2 (emphasis added).

[54] *Id.* (emphasis added).

review of monitoring of Subscriber's own open accounts and/or closed accounts with balances owing, and for no other purpose."[55] Trinity Financial could not assign or transfer its rights under the agreement to any third party without Trans Union's consent.[56] The agreement authorizes Trinity Financial to pull credit on behalf of "affiliates" listed.[57] Trinity Financial lists no affiliates.[58] Further, nowhere in this contract is Trojan mentioned.[59]

**In Discovery, both Trinity Financial and Trinity Recovery Admit to Repeatedly Procuring Plaintiff's Credit Report for Other Companies, in Contravention of Trinity Financial's Privacy Policy.**

16.    Both Trinity Financial and Trinity Recovery's verified interrogatory responses stated that any pulls for Plaintiff prior to August 2015 would have been made for Trinity Financial, whereas any pulls for Plaintiff after August 2015 would have been made for Trojan.[60] Both defendants stated that these requests were "part of a broader request for credit reports for a multitude of debtors."[61] The Experian, Trans Union, and CoreLogic contracts do not appear to explicitly identify any "affiliate" companies, nor do they appear to specify that credit reports will be pulled by Trinity Financial or Trinity Recovery on any other entity's behalf.[62] The Corelogic, Trans Union, and Experian contracts never expressly mention Trojan in any capacity.[63]

---

[55] *Id.* at 4.
[56] *Id.* at 17.
[57] *Id.* at 1, 21.
[58] *Id.*
[59] *See generally* TU Contract.
[60] Trinity Recovery Services, LLC's Jan, 25, 2018 Supplemental Responses to Plaintiff's First Set of Interrogatories and Requests for Production, at ROG 5 ("Trinity Recovery Discovery Responses"), **Exhibit B-2**; Clark Decl., at ¶ 7; Trinity Financial Discovery Responses, at ROG 8.
[61] Trinity Recovery Discovery Responses, at ROG 5;   Trinity Financial Discovery Responses, at ROG 8.
[62] *See generally* Corelogic Contract Docs; Experian Contract; TU Contract.
[63] *See generally id.*

17.     Trinity's policies indicate that "Personal data should be obtained only for the purpose specified."[64]

**Trinity Financial Procures Plaintiff's Credit Information from Credco, Experian, and Trans Union both Before and After It Had Any Account Relationship with Plaintiff.**

18.     Trinity Financial, through CoreLogic, acquired Plaintiff's credit information after the April 30, 2015-November 25, 2015 period when it represented to Plaintiff that it held any interest at all in his loan and note.

19.     Specifically, Credco provided Trinity Financial with Plaintiff's information from Experian on at least 14 occasions: on May 29, 2015; August 19, 2015; November 11, 2015; *December 7, 2015; January 26, 2016; March 8, 2016; April 20, 2016; October 12, 2016; December 8, 2016; January 9, 2017; February 15, 2017; April 12, 2017; July 28, 2017; and November 20, 2017.*[65]

20.     Credco also provided Trinity Financial with Plaintiff's information from Trans Union on at least six occasions: February 25, 2015; August 19, 2015; September 24, 2015; November 2, 2015; November 11, 2015; *and January 19, 2016.*[66]  There is no record of any Corelogic requests directly naming Trinity Recovery.

21.     Trinity Financial also appears to have pulled Plaintiff's credit report directly from Trans Union on September 20, 2016, January 3, 2017, and February 1, 2017.[67]

---

[64] Trinity Policies, at 1.   Trinity has not produced any more specific policies and procedures pertaining to its compliance under the FCRA, or its procedures for ensuring the privacy of consumer information.  *See* Clark Decl., at ¶ 14; Trinity Policies, at 1-7.

[65] *See* Excerpts of Corelogic Credit Reports to Trinity Financial from Corelogic Subpoena Return (redacted) ("Corelogic Credit Reports"), **Exhibit B-5**.  The term "XPN" measn "Experian."  *See* Clark Decl., at ¶ 10.  For ease of reference and to avoid burdening the Court with unnecessary information, only the first page of each credit report has been provided, although the complete reports can also be provided if needed.  *See* Clark Decl., at ¶ 10.

[66] *See* Corelogic Credit Reports.  The term "TUC" means "Trans Union."  *See* Clark Decl., at ¶ 10.  For ease of reference and to avoid burdening the Court with unnecessary information, only the first page of each credit report has been provided, although the complete reports can also be provided if needed.  *See id.*

[67] *See* Trans Union Credit Reports to Trinity Financial  (redacted) ("TU Credit Reports"), **Exhibit B-7**; Clark Decl., at ¶ 12.

**Plaintiff Requests and Reviews His Trans Union Consumer Disclosures, and Discovers Allegedly Impermissible Soft Credit Pulls**

22.     On or about January 1, 2016, Plaintiff accessed his credit report from Trans Union LLC ("Trans Union").  Thereon, he discovered several pulls from "Trinity Financial SE via CREDCO," with an address at PO Box 509124, San Diego, CA 92150.  Plaintiff's information had been requested on November 11, 2015; September 9, 2015; August 19, 2015; and February 25, 2015.[68]  The permissible purpose identified for each pull was listed as "ACCOUNT REVIEW," even though, as of February 2015 at the latest, Trinity Recovery had relinquished its ability to procure a Credco report for purposes of "account review," and Trinity Financial had no apparent ability to pull credit from Credco at all.[69]

23.     On or about January 27, 2017, Plaintiff pulled his Trans Union credit report again.  Trans Union again listed the same four credit pulls from "Trinity Financial SE via CREDCO."  It additionally listed a credit pull from January 19, 2016.  The permissible purpose identified for each pull was also "ACCOUNT REVIEW."[70]

24.     Trinity Services has never purported to have a business relationship with Plaintiff at all, and there is no indication that they procured any Credco credit report relating to Trans Union.[71]

**Plaintiff Requests and Reviews His Experian Consumer Disclosure, and Discovers Allegedly Impermissible Soft Credit Pulls**

25.     On or about January 27, 2017, Plaintiff also accessed his credit report from Experian Information Solutions, Inc. ("Experian").  Thereon, under "inquiries," Experian

---

[68] Mott Decl., at ¶ 15; Jan. 1, 2016 Trans Union Disclosure for Plaintiff (redacted), at 8 ("2016 TU Disclosure") **Exhibit C-5**. On information and belief, "Trinity Financial SE" is either Trinity Financial or Trinity Services.
[69] *See* 2016 TU Disclosure, at 8.
[70] *See* Mott Decl., at ¶ 14; Jan. 27, 2017 Trans Union Disclosure for Plaintiff (redacted), at 8 ("2017 TU Disclosure"), **Exhibit C-4**.
[71] *See generally* 2016 TU Disclosure; 2017 TU Disclosure.

listed a number of credit pulls for "Trinity." These pulls were all listed under "inquiries shared only with you," or "soft" credit pulls.[72]

26.     First, Experian listed "Credco/Trinity Recovery Svcs," which on information and belief was Trinity Financial or Trinity Recovery.[73] This company made at least three soft pulls: on May 29, 2015, August 19, 2015, and November 11, 2015.[74] Another entry for this company listed a fourth soft pull on May 29, 2015.[75] No explanation for any of these pulls was given.[76]

27.     Second, Experian listed "Credco/Trinity Financial," which on information and belief was Trinity Financial. This company made eight soft pulls: on 12/7/2015; 1/26/2016; 3/8/2016; 4/20/2016; 6/6/2016; 10/12/2016; 12/8/2016; and 1/9/2017. No explanation for any of these pulls was given.

28.     Third, Experian listed "Trinity Recovery Service."[77] This company made two soft pulls: on 2/26/15 and 4/1/2015.[78] No explanation for either of these pulls was given.[79]

**Plaintiff Has Incurred Damages.**

29.     Plaintiff believes Defendants' conduct is willful, entitling him to an award of statutory damages.[80] He has also incurred actual damages in the form of lost time and emotional distress.[81] He believes an appraisal of his damages is best left for the jury.[82]

---

[72] Mott Decl., at ¶ 16; Jan. 27, 2017 Experian Disclosure for Plaintiff (redacted) ("Experian Disclosure"), **Exhibit C-6**.
[73] *See* Mott Decl., at ¶¶ 16-18; Experian Disclosure, at 7-9.
[74] *See* Mott Decl., at ¶¶ 17-18; Experian Disclosure, at 7-9.
[75] *See* Mott Decl., at ¶¶ 17-18; Experian Disclosure, at 7-9.
[76] *See* Mott Decl., at ¶¶ 17-18. Experian Disclosure, at 7-9.
[77] *See* Mott Decl., at ¶¶ 17-18.  Experian Disclosure, at 7-9.
[78] *See* Mott Decl., at ¶¶ 17-18.  Experian Disclosure, at 7-9.
[79] *See* Mott Decl., at ¶¶ 17-18.  Experian Disclosure, at 7-9.
[80] Mott Decl., at ¶ 19.  *See also* Original Complaint, ECF Dkt. 1.
[81] Mott Decl., at ¶ 19.  *See also* Original Complaint, ECF Dkt. 1.
[82] Mott Decl., at ¶ 19. Defendants never noticed Plaintiff's deposition in this case, served any written discovery on Plaintiff, or sat for their depositions.  *See* Clark Decl., at ¶¶ 4-5.

**STANDARD OF REVIEW**

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[83]  Material facts are those that may affect the outcome of the case.[84] A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.[85] "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor."[86] A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims."[87]

In determining whether to grant or deny summary judgment, courts apply a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."[88] In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.[89] If the moving party

---

[83] Fed. R. Civ. P. 56(a).
[84] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[85] *Id.*
[86] *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).
[87] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).
[88] *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).
[89] *See Celotex*, 477 U.S. at 323–24.

fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.[90]

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists.[91] To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."[92] In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data.[93] Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial.[94]

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.[95] The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor."[96] But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted.[97]

## DISCUSSION

### 1. Defendants Violated the FCRA.

The FCRA permits third parties like Defendants access to a consumer's private data from a CRA for only one of several explicitly defined "permissible purposes."[98] For

---

[90] *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).
[91] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).
[92] *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).
[93] *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).
[94] *See Celotex*, 477 U.S. at 324.
[95] *See Anderson*, 477 U.S. at 249.
[96] *Id*. at 255.
[97] *See id.* at 249–50.
[98] *See* 15 U.S.C. § 1681b.

example, information may be provided to "a person which [the CRA] has reason to believe (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer."[99]   A third party may pull credit when that third party "otherwise has a legitimate business need for the information (i) in connection with a business transaction that is initiated by the consumer; or (ii) to review an account to determine whether the consumer *continues* to meet the terms of the account."[100]

The Ninth Circuit has recently held that disclosures that weren't meaningfully authorized by a consumer result in a concrete informational injury to a consumer's rights to privacy,[101] which trial courts in this district have directly applied to circumstances where former creditors pulled a consumer's credit without having any open accounts with that consumer.[102]   Additionally, Section 1681b(f) provides that "A person shall not use or obtain a consumer report for any purpose unless (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification."[103]

15 U.S.C. § 1681a(d) defines a "consumer report" for purposes of the FCRA, and mandates that a person must have a permissible purpose to obtain a consumer report.[104] Section 1681a(d) contains several exceptions to this requirement, which presuppose the business reality that corporations may structure their entities in a manner which requires disclosure of a consumer's information within business units, without that information being

---

[99] *Id.* § 1681a(3)(A).

[100] *Id.* § 1681b(a)(3)(F)(ii) (emphasis added).

[101] *See Syed v. M-I, Inc.*, 846 F.3d 1034 (9th Cir. 2017).

[102] *See, e.g.*, *In re Ocwen Loan Servicing LLC Litig.*, 240 F. Supp. 3d 1070, 1075 (D. Nev. 2017) (considering violation of 15 U.S.C. § 1681b); *Smith v. One Nevada Credit Union*, No. 16-cv-2156-GMN-NJK, 2017 WL 2803169 (D. Nev. June 27, 2017) (interpreting *In re Ocwen*).

[103] 15 U.S.C. § 1681b(f).

[104] *Id.* at §§ 1681a(d); 1681b.

a "consumer report" and triggering the permissible purpose restrictions.   15 U.S.C. § 1681a(d)(2)(A) provides:

> **(2)EXCLUSIONS.**—Except as provided in paragraph (3), the term "consumer report" does not include—
> > **(A)**subject to section 1681s–3 of this title, any—
> > > **(i)** report containing information solely as to transactions or experiences between the consumer and the person making the report;
> > > **(ii)** communication of that information among persons related by common ownership or affiliated by corporate control; or
> > > **(iii)** communication of **other information** among persons related by common ownership or affiliated by corporate control, **if it is clearly and conspicuously disclosed to the consumer that the information may be communicated among such persons and the consumer is given the opportunity, before the time that the information is initially communicated, to direct that such information not be communicated among such persons;**[105]

Subsections 1681a(d)(2)(A)(i) and (ii) are designed to address the commonsense problem that companies which have a routine business relationship with a consumer may collect information regarding that consumer as a matter of course, and exchange such limited, transaction-related information without incurring penalties.   Thus, for example, if Trinity Financial had an actual account relationship with Plaintiff, and if Trinity Financial both sent and received correspondence from Plaintiff in the course of that relationship, then Trinity Financial could transfer that information to the "related" entity Trojan without being held liable for generating and sending a consumer report to a third party under subsections 1681a(d)(2)(A)(i) and (ii).   However, the consumer reports Trinity Recovery and Trinity Financial procured from Plaintiff clearly aren't limited to transactions or experiences solely between these entities and Plaintiff – because the information was procured from a third party itself, i.e., Experian and Trans Union.   Thus, the exceptions to a "consumer report" in subsections 1681a(d)(2)(A)(i) and (ii) can't apply to the transaction.

Subsection 1681a(d)(2)(A)(iii) places clear limitations on transmission of information

---

[105] *Id.* at § 1681a(d)(2)(A) (emphasis added).

which goes beyond mere "transactions and experiences."  It states that "other information" (i.e., information that is not "solely as to transactions or experiences between the consumer and the person making the report," such as a consumer report from Experian or Trans Union) can be exchanged between closely related entities "if it is *clearly and conspicuously disclosed to the consumer* that the information may be communicated among such persons and the consumer is given the opportunity, *before the time that the information is initially communicated*, to direct that such information not be communicated among such persons."[106]

Here, Plaintiff's uncontested testimony is that the payment obligations on his Note were satisfied after First Franklin forgave his continued loan obligations in 2009.  Thus, neither Defendant had any permissible purpose to pull credit at all, because there was no interest of any kind to acquire for *any* of the pulls in question.[107]  Further, there is no evidence that Plaintiff was ever provided with notice of defendants' intent to pull credit on behalf of any affiliated companies in 2015, and Plaintiff has disavowed that he received any such notice.[108]  In fact, there is no indication that Trinity Recovery *ever* had any involvement with Plaintiff's loan at all.[109]  Thus, the consumer reports Defendants procured from Experian and Trans Union via Corelogic couldn't be shared with each other, or with Trojan, without telling Plaintiff first and giving him the opportunity to object.  Defendants failed to do so, and any sharing violated the FCRA.

Further, there's no evidence that Trinity Financial ever told Plaintiff that it would continue to pull credit on behalf of Trojan after Trinity Financial unequivocally disavowed its "interests" in Plaintiff's home, or that Trinity Recovery would be making such pulls at all; nor is there evidence on Rodney's consumer reports that Trinity or Trinity Recovery made any pulls "on behalf of" either each other or on behalf of Trojan.  Procuring the same

---

[106] *Id.* at § 1681a(d)(A)(iii).

[107] Statement of Undisputed Material Facts ("SUMF"), at ¶¶ 1-4.  *See also generally* Collateral Litigation.

[108] SUMF, at ¶¶ 8-9.

[109] *Id.* at ¶ 6.

violated Section 1681b(f) of the FCRA.

But even assuming that a lack of any relationship could excuse Defendants' ability to procure credit and further permitted them to pull credit for affiliated companies like Trojan, Plaintiff unequivocally objected to any *continued* sharing when he sent his October 8, 2015 Cease-and-Desist letter when he stated that "the publishing of any derogatory information to any . . . Third Party not specifically authorized by me, will be strictly prosecuted to the full extent of the law."[110]   Shortly thereafter, Trinity Financial represented to Plaintiff that it would be transferring its "interest" in Plaintiff's home to Trojan as of October 30, 2015.[111] However, Trinity Financial continued to pull Plaintiff's credit in 2016 and 2017.[112]   All of the pulls after October 8 were impermissible to the extent Defendants pulled on behalf of Trojan, and Defendants admitted that all of the pulls made after August 2015 would have been made for this reason.[113]   At an irreducible minimum, no pulls after 2015 were permissible.

Defendants also violated Section 1681b(f) because in 2015 Trinity Recovery restricted its purpose for obtaining credit reports via Credco to investment purposes, but it continued accessing credit through Credco from Trans Union (at least) for purposes of "account review."[114]   Additionally, none of the contracts with Trans Union, Experian, or Credco mentioned Trojan as an entity for which Defendants would be pulling credit,[115] and the Credco contract expressly required Trinity Recovery to identify all other entities for which credit would be pulled.[116]   Trans Union's contract expressly forbade Trinity Financial from sharing credit information with any other third party.[117]

---

[110] *Id.* at ¶ 8.
[111] *Id.* at ¶ 9.
[112] *See id.* at ¶¶ 19-23, 25-28.
[113] *See id.* at ¶ 16.
[114] *See id.* at ¶¶ 12, 22-23.
[115] *See id.* at ¶¶ 12-15.
[116] *See id.* at ¶ 12.
[117] *See id.* at ¶ 15.

**2.  Defendants' Conduct was Willful.**

Under the FCRA, a plaintiff may demonstrate willfulness by showing a reckless disregard of statutory duty, including 15 U.S.C. § 1681s-2(b).[118]  A defendant acts in reckless disregard if its action "is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."[119]  A defendant is liable if it takes action involving "an unjustifiably high risk of harm that is either known or so obvious that it should be known."[120]  "The statutory requirement of willfulness does not require proof of intent to cause harm, but only an intent to fail to comply with the FCRA."[121]  A consumer can recover punitive damages for willful non-compliance.[122]  "Courts in this circuit have found that '[w]illfullness under the FCRA is generally a question of fact for the jury.'"[123]  A consumer can recover punitive damages for willful non-compliance.[124]

In this case, there can be little doubt that both Trinity Financial and Trinity Recovery procured Plaintiff's credit report from numerous sources when, by their own admission, they had no permissible purpose to do so – even though the contracts they signed required them to comply with applicable federal law.[125]  Defendants continued to pull Plaintiff's credit report numerous times after they had disavowed all interest in Plaintiff's loan,[126] after Plaintiff asked them to stop procuring on behalf of others,[127] and after Trinity Financial represented to

---

[118] *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56–60 (2007).

[119] *Bateman v. Am. Multi-Cinema*, 623 F.3d 708, 711 n.1 (9th Cir. 2010) (quoting *Safeco*, 551 U.S. at 69).  *See also Smith*, 2017 WL 2803169 (D. Nev. June 27, 2017).

[120] *Id.* (quoting *Safeco*, 551 U.S. at 68).

[121] *Centuori v. Experian*, 431 F. Supp. 2d 1002, 1011 (D. Ariz. 2006)

[122] 15 U.S.C. § 1681n.

[123] *Taylor v. First Advantage Background Servs.*, 207 F. Supp. 3d 1095, 1110 (N.D. Cal. 2016) (quoting *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007)) (citing *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995)).

[124] 15 U.S.C. § 1681n.

[125] *See* SUMF, at ¶¶ 12-15.

[126] *See id.* at ¶¶ 16, 19-23, 25-28.

[127] *See id.* at ¶¶ 9, 19-23, 25-28.

Plaintiff that they no longer held any "interest" in Plaintiff's home.[128]  Defendants pulled
Plaintiff's Trans Union credit information from Credco for "account review" purposes long
after they explicitly relinquished their right to solicit Credco's help in doing so;[129] Trinity
Financial later pulled it on Trojan's behalf in contradiction of the explicit letter of its Trans
Union contract.[130]  Trinity Financial apparently buys and sells loans on a mass scale, and
there is no indication that they treated Plaintiff's interest any different than those of other
homeowners; indeed, Plaintiff's "loan" was transferred to Trojan along with 75 others.[131]  In
sum, Defendants knew exactly what they were doing, knew they could not do it, and
committed their violations of the FCRA on a mass scale.  Defendants' conduct was willful.

### 3.  Calculation of Plaintiff's Actual Damages Should Be Left for the Jury.

Even if Defendants' conduct was not willful, it was undisputedly negligent, entitling
Plaintiff to actual damages. "The term 'actual damages' has been interpreted to include
recovery for emotional distress and humiliation."[132]  Under the FCRA, a plaintiff's out-of-
pocket costs can constitute cognizable economic damages.[133]  A denial of credit is not a
prerequisite to recovery under the FCRA.[134]  Plaintiff has declared that he suffered actual
damages, in the form of emotional distress and lost time.[135]  Plaintiff concedes that
calculation of his actual damages is appropriately reserved for the jury.[136]

---

[128] *See id.*

[129] *See id.* at ¶¶ 12, 22-23.

[130] *Id.* at ¶ 15.

[131] *See id.* at ¶ 9.

[132] *Id.* (citing *Johnson v. Department of Treasury, I.R.S.*, 700 F.2d 971, 984 (5th Cir.1983) (finding mental anguish recoverable in FCRA claims); *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 514 (5th Cir. 1982); *Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834–35 (8th Cir. 1976); *Bryant v. TRW, Inc.*, 487 F. Supp. 1234, 1240 (E.D. Mich. 1980), *aff'd*, 689 F.2d 72 (6th Cir. 1982); *Jones v. Credit Bureau of Huntington, Inc.*, 184 W.Va. 112, 117, (1990)); *see Drew v. Equifax Info. Servs., LLC*, 690 F.3d 1100, 1109 (9th Cir. 2012).

[133] *Saenz*, 621 F. Supp. 2d 1074, 1085 (D. Or. 2007).  Plaintiff has also incurred attorney's fees as a result of prosecuting this action.

[134] *Guimond*, 45 F.3d at 1333 (9th Cir. 1995).

[135] SUMF, at ¶ 29.

[136] *Id.*

**CONCLUSION**

For the foregoing reasons, Plaintiff requests that summary judgment be granted against Defendants for Plaintiff's individual claims.

DATED this 10th day of August, 2018.

Respectfully submitted,

/s/ Miles N. Clark, Esq.
Matthew I. Knepper, Esq.
Miles N. Clark, Esq.
10040 W. Cheyenne Ave., Suite 170-109
Las Vegas, NV 89129

David H. Krieger, Esq.
HAINES & KRIEGER, LLC
8985 S. Eastern Avenue, Suite 350
Henderson, Nevada 89123

Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2018, and pursuant to the Federal Rules of Civil Procedure, a true and correct copy of the foregoing **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** was served via the U.S. District Court's electronic filing system to all individuals entitled to receive service thereon.

<u>/s/ Lucille Chiusano</u>
An Employee of Knepper & Clark LLC